TWINING (LINDSAY v.). See Case No. 8,-367.

TWITCHELL (ROLLINS v.).. See Case No. 12,027.

TWO ANCHORS & CHAINS (LLEWELLYN v.). See Case No. 8,428.

TWO BARRELS (UNITED STATES v.). See Case No. 16,575.

TWO CASES OF WOOLENS (UNITED STATES v.) See Case No. 16,576.

## Case No. 14,288.

### The TWO CATHERINES.

[2 Mason, 319.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1821

SEAMEN — WAGES — WRECKED VESSEL—VOYAGE— EARNED FREIGHT—SALVAGE.

1. A ship sailed on a voyage from Newport to Gibraltar, and there landed her cargo and went

[1] [Reported by William P. Mason, Esq.]

in ballast to Ivica for a cargo of salt, and after taking it on board proceeded on her homeward voyage for Providence, and was wrecked on an island in Narragansett Bay, and the cargo totally lost, but the ship's tackle, &c., were saved. *Held*, that the seamen were entitled to wages up to the arrival of the ship in Ivica, and half the time she stayed there.

[Cited in Willard v. Dorr, Case No. 17,680. Disapproved in Bronde v. Haven, Id. 1,924. Cited in The General Chamberlain, Id. 5,310.]

2. They were not entitled to their wages for the homeward voyage, because no freight was earned.

[Disapproved in Bronde v. Haven, Case No. 1,924. Cited in Reed v. Hussey, Id. 11,646. Approved in Cartwell v. The John Taylor, Id. 2,482. Cited in The Niphon's Crew, Id. 10,277; Drew v. Pope, Id. 4,080.]

3. The seamen were entitled to salvage for saving the materials of the ship, and, under the circumstances, a salvage was allowed equal to the amount of their wages for the homeward voyage.

[Cited in The Wave, Case No. 17,297; Hobart v. Drogan, 10 Pet. (35 U. S.) 122. Followed in Pitman v. Hooper, Case No. 11,186. Cited in The Centurion, Id. 2,554; Mesner v. Suffolk Bank, Id 9,493; The Dawn, Id. 3,666. Approved in Cartwell v. The John Taylor, Id. 2,482; The Massasoit, Id. 9,260; The Niphon's Crew, Id. 10,277; The Umattilla, 29 Fed. 257.]

4. The contract of the seamen is not dissolved by shipwreck; but they are bound to labour to preserve the wreck of ship and cargo; and if they leave the ship without endeavouring to save them, they desert their duty, and may forfeit wages antecedently due.

[Cited in The Dawn, Case No. 3,666; The Massasoit, Id. 9,260. Distinguished in The D. M. Hall and The John Land, Id. 3,939.]

5. The salvage paid to seamen in cases of shipwreck is a charge on the property saved, and to be borne by the underwriters, if the ship is abandoned to them.

[Cited in Brown v. Lull, Case No. 2,018; Pitman v. Hooper, Id. 11,186. Followed in Cartwell v. The John Taylor, Id. 2,482.]

[On certificate from the district court of the United States for the district of Rhode Island.]

Libel for mariners' wages and salvage, certified from the district court on account of the interest of the district judge, pursuant to the statutes of May 8, 1792, c. 36, § 11 [1 Stat. 278], and of March 3, 1821, c. 51 [3 Stat. 643]. The original libel was for mariners' wages, but as amended it wore a double aspect, asserting a right to wages, and if that could not be sustained, claiming a right to salvage equivalent to wages. The material facts were these: The ship on the 16th of April, 1821, sailed on her voyage from Newport, and arrived at Gibraltar, and there discharged her cargo, and thence proceeded in ballast to Ivica for the purchase of a return cargo of salt. She duly arrived at Ivica in June, and there took on board a cargo of salt, and on the 10th of July sailed on her homeward voyage for Providence. On the 3d of September following in the evening she was shipwrecked on Dutch Island, in Narragansett Bay, and soon afterwards sunk. The shipwreck was occasioned by a heavy gale of wind, which continued during a great part of the night. The master and crew remained by the ship during all the night, exposed to great peril and hardship, and made every exertion to save the tackle and apparel of the ship; and by their efforts and the encouragement of the master, that their wages depended upon the salvage from the wreck, the principal part of the sails, rigging, cables, and appurtenances were saved, and carried on shore at Dutch Island. The crew remained on board doing duty for three days after the wreck, and until they were discharged by the agent of the underwriters, to whom the ship was abandoned in the interval, and who accepted the abandonment. The cargo was totally lost by the shipwreck. Since the libel was filed, the ship has been weighed and repaired, and brought to Providence. But the present was a proceeding in rem against the property saved [the Providence Washington Insurance Company, claimants]. The wages had been paid up to Gibraltar, and during half the time the ship lay there.

Pitman & Tillinghast, for libellants. The shipping articles in this case constitute a maritime contract, which is to be construed and governed by the maritime law. This law, in the construction of contracts, is regulated by those principles of natural justice, which are the same in Westminster as in Rome, moulded by those principles of policy, which the wisdom and experience of all maritime nations have found essential to the prosperity of commerce and navigation. Hence we are to seek for the principles of maritime law among those nations of ancient or modern times, who have been the most conversant in maritime affairs. Hence also, maritime questions are out of their element in courts of common law, but have been carried thither, because in the contention between the courts of common law and admiralty in England, the stronger party prevailed, and the admiralty had no power to grant a writ of prohibition, when the former created their fictions, to extend their jurisdiction. In this country it is of the utmost importance, that on maritime questions, we should be governed by that wisdom of mankind in reference to things maritime, which is called maritime law. First, because a uniformity of decision throughout the United States is essential to our maritime prosperity. And, secondly, the extent of our country from the frozen to the torrid zone, and from the Atlantic to the Pacific, assures us of the greatness of our commercial destiny; and as we are now laying the foundations of maritime jurisprudence, we should seek for wisdom upon such subjects, where only wisdom is to be found. The contract for seamen's wages, being a contract, is to be construed like all other contracts, except so far as being a maritime contract, it is controlled by the policy of maritime law. It is a contract for services to be rendered on board a certain vessel during a certain voyage. To entitle the sea-

man to his wages, he must perform the contract; his duties and rights are correlative. If the voyage is not performed according to the principles regulating other contracts of the like nature, the seaman would not be entitled to his wages, but here this contract is moulded by the policy of the maritime law for the benefit of the seamen; the voyage is divided into as many parts as there are ports of discharge in the course of the voyage, at which the vessel earns freight, and the seamen are considered as entitled to their wages for each of these sub-divisions of the voyage. Here, the rule, that "freight is the mother of wages," operates to the benefit of the seamen, and is probably one of the reasons of the rule. The contract, however, is not, that the vessel shall earn freight, but that the seamen will perform certain services on board of her for a certain voyage. If the services and voyage are performed, and the vessel goes and returns empty, it is not the concern of the mariners, and they shall have their wages. This is in conformity with the principles of natural justice, and the policy of the law. If the vessel be lost, and cargo saved, they shall have their wages to the amount of the freight, if any, where the cargo does not belong to the captain or owners, and to the amount of the cargo saved, where it does; and where no freight is earned, in such a case the sailors are entitled to compensation as salvors merely, but this cannot be claimed under the contract. So, where the freight is lost, or the cargo, not by the default of the sailors, and the vessel is saved, or a sufficiency of her to pay the wages, why shall not the mariners be allowed their wages? The same reasons of policy, which would give sailors their wages, where the ship was lost and the cargo saved, would give them their wages, where the cargo was lost and the ship was saved. The same reasons of policy require, that mariners should be induced to save the ship as well as the cargo. And, accordingly, we find, that in the latter case, the laws of Oleron gave the seamen a compensation, and the ordinance of Philip II. of Spain, the laws of Wisbuy, the Hanseatic and the French ordinances, which have been cited, give the sailors their wages in such cases. But it is said, "freight is the mother of wages;" this is true as an affirmative proposition; but does it from thence follow that no wages are recoverable where no freight is earned, though the ship may be saved? Abbott, in his treatise on Shipping (page 444), says: "If by any disaster happening in the course of the voyage, such as the loss or capture of the ship, the owners lose their freight, the seamen also lose their wages." He cites Molloy, bk. 2, c. 3, § 10; 1 Sid. 179; Abernethy v. Landale, Doug. 539; French Ordinance, liv. 3, tit. 4; Des Louages des Matelots, art. 8. Molloy states the rule in these words: "But if the ship perishes at sea, they (the mariners) lose their wages, and the owners the freight. And this being the marine cus-

tom, is allowed by the common law as well as the civil law." Here, it will be observed, that the wages are made dependent on the safety of the ship, not on the freight, which by the loss of the ship shares the same fate as the wages. The rule as laid down in Siderfin, is, "that, if in the case of the loss of the ship by tempest, enemies, &c. the mariners were to receive their wages, they would not hazard their lives for the safety of the ship." But this reason would authorize the mariners to receive their wages, when they saved enough from the wreck to pay them, to induce them in such cases to hazard their lives for the preservation of the ship, or of any part thereof. The case cited from Douglas was a case of total loss of ship by capture; in such a case, there can be no doubt, but that wages and freight are both lost. The French ordinance cited is evidence of the rule, where there is loss of ship and freight; but it will be seen by reference to the same ordinance (liv. 3, tit. 4, art. 9) that it expressly directs the payment of wages out of the relicks and materials of the ship. Abbott, in page 437 of the above treatise, says, that he has not been able to find any decision of any English court on the point, which is now before the court, but thinks, that on principles of law the sailors would have no claim on the ship for wages. In this country there are decisions expressly on this point, at common law, and in the admiralty. The case of Frothingham v. Prince, 3 Mass. 563, is directly in point. See, also, Relf v. The Maria [Case No. 11,692, note], (observations of Judge Winchester). He says, "The contract of the sailors is a species of copartnership between them and the owners. If all is lost the sailors lose their wages; but if all is not lost, that which remains of ship and freight, is a common property, pledged for the payment of wages. Freight gained and put on shore in the course of the voyage, is saved from a subsequent shipwreck. It goes into the common stock; but like the savings from a wreck, is to the last nail or cable hypothecated to the wages." Giles v. The Cynthia [Id. 5,424], (a decision of Judge Peters). He there says, "The wages for the interval, after the vessel leaves her last port of delivery to the time of the wreck, depend on circumstances. The sailors must assist in saving the ship and goods, or so much thereof as possible, so as to entitle them, by way of encouragement, to their wages out of the property saved." In the case of Weeks v. The Catharina Maria [Id. 17,351], is given a decision of Judge Hopkinson. He there said, "So long as the duty of the mariners calls for their attention and services in the preservation of the ship or cargo, or of any part thereof, so long does their lien for wages inure, in proportion at least to the value of the property so saved." The case of Dunnett v. Tomhagen, 3 Johns. 154, does not affect the above decisions. That was a case of a total loss of the vessel; a portion of the

cargo was saved, which did not belong to the captain or owners, and was brought in another vessel to a place of safety. It was decided, as no freight was here earned, no wages were due, but that the mariners, as against the owners of the merchandize, might be entitled to salvage in proportion to the services rendered by them in saving this property. No fault can be found with this decision. The owners of this merchandize were no parties to the contract, under which the mariners can only claim their wages; and as all the property of the captain and the owners of the ship was lost, (viz. the ship and freight) they had nothing saved from which the seamen could recover their wages. The saving this portion of the cargo was no benefit to any but the owners of the cargo, and the mariners could claim nothing of them but in the character of salvors.

These principles determine in what character the libellants are to recover in this case, whether as salvors merely, or seamen. Salvors are volunteers, no duties are imposed upon them, and their reward is a part of the property saved in proportion to the services performed, and the benefit received. Mariners have duties to perform in reference to the vessel and the cargo, growing out of their contract as construed and moulded by the maritime law. So far as their duties extend their rights extend; so long as they perform what is required of them, so long they are entitled to the reward of their services as fixed by the contract; for it would be a strange construction of this contract, which should impose upon them all the duties at the very time, that the contract in reference to their wages should be considered as dissolved. It is admitted by all, that it is the duty of the mariner to remain by the ship in case of wreck, and to save all he can of the ship and the cargo. Why is it thus made his duty? Because the law gives this effect to his contract, and requires this at his hands. The same law, therefore, while it imposes upon him this duty, will give him the benefit of his contract, and enable him to recover his wages, if, thereby, a sufficiency is saved for that purpose.

A case has been put by the opposite counsel, in the argument, viz. suppose the ship arrives in safety, and all the cargo is lost, are the sailors entitled to their wages? And the answer, which has been given to it, is, that the sailors are not entitled to their wages in such a case, because their wages are dependent on the earning of freight. The title to wages, however, I consider as dependent on the services rendered, and not on the question of freight entirely. In the case supposed, it may be asked, how can the vessel arrive safe, and the cargo be lost? If by jettison, then clearly the sailors are entitled to their wages; the jettison was for the benefit of all, the owners of the ship saved shall contribute: but it is well settled, that the sailors shall not contribute in this case, and so recognized in the case of The Saratoga, decided in this circuit, which has been cited. If not holden to contribution, a fortiori they shall not lose all in such a case. If this loss of the cargo is occasioned by the nature of the cargo, as this is a subject, over which the sailors have no control, it would be hard, that their wages should be affected by it. If, in this case, should the cargo consist of salt, the vessel spring a-leak, and the mariners be employed for most of the voyage at the pumps, and the cargo be in this manner pumped out, should the loss thus occasioned produce a loss of wages? This would be contrary to all principles of natural justice, or maritime policy. The services of the mariners have been the more arduous in consequence of this, and their services have saved the vessel; surely in such a case they must be entitled to their wages. I do not contend, however, that it is of any consequence as to the question of wages, what is the cargo. It must be admitted, that if the owners put no cargo on board, the sailors are entitled to their wages on the arrival of the vessel; and it would be strange indeed, if by reason of a bushel of salt being put on board the wages of the sailors could be made to depend upon the safe arrival of this bushel of salt, and not upon the safety of the ship. But I do contend, that wherever the sailors perform their contract, whether freight is earned or not, or the cargo arrives safe or not, that they are entitled to their wages. That their contract is, not that the vessel shall earn freight, or that she shall carry a cargo in safety, but that they will perform certain services on board of the vessel for a specified voyage. If the services are performed, if the voyage is performed, their contract is performed, and they, upon every principle of justice, must be entitled to the stipulated reward. Is there any principle of maritime policy, which forbids this? None. On the contrary, as policy requires, that every inducement should be held forth to mariners to do their duty, it requires that their wages should be paid them in such a case. Against the loss of freight, or the loss of cargo, the owners may insure, but the mariners cannot insure their wages. This supposed case is not the one before the court, but it serves the purpose of elucidation, as to what extent the maxim, that "freight is the mother of wages," is to govern in cases like the present. The case before the court is one, in which the mariners have done their duty, have performed their services on board the vessel, until she arrived within a short distance of her destined port, and the termination of the voyage, when they were overtaken by a tempest, the vessel became a wreck, the cargo, being but a small portion of the proceeds of the outward cargo, returned to its original element, and the tackle and apparel of the vessel was saved by the crew at the hazard of their lives. In such a case,

although by the strict terms of their contract, the voyage not having been performed, they may not be entitled to their wages, yet by the marine law, governed by the soundest maxims of an enlightened policy, in the language of Judge Peters (Taylor v. The Cato [Case No. 13,786]), the mariner, "as a salvor, regains a rightful claim to wages restored by his exertions in rescuing the articles saved (whether parts of the ship or cargo) from the perils and loss to which the wreck had exposed them." The mariner cannot receive all his wages, unless the property saved be sufficient in value to pay them; hence his claim to wages in such a case is as a salvor, and yet his claim is for wages under his contract, and not simply for salvage, because salvors, as before observed, are mere volunteers, but the law has imposed this service upon the mariner, and given him a correspondent right; and if his claim was purely as a salvor, he would only be entitled to a portion of the property saved, whereas the whole belonging to the captain and owners, shall be taken, if necessary, to satisfy in such a case the claim of the mariner.

Whipple & Searle, for claimants, contended, that the action for wages was not founded on the service performed by the mariner, but on the earning of freight. 12 Johns. 324. That if a seaman was sick, without any fault of his own, for the whole voyage, he would, notwithstanding, recover wages for the whole time; so if he was captured and put on board of an enemy's ship, and the ship is afterwards re-captured and earns freight, he is entitled to his wages. In this case the seaman performs no service, and yet receives full wages. In the case of a ransom, he performs full services, and receives but a part of his wages, because he must pay a portion of the ransom money; so if a part of the freight is advanced, and the ship is lost, he recovers a proportion of his wages. 2 Show. 283; Abb. Shipp. 484. In the case of a total loss, where no freight is earned, although he performs full services, he receives no wages. In cases of wreck, salvage is allowed, but no wages. Taylor v. The Cato [supra]. On an abandonment of the ship, the owners, and not the underwriters are responsible for wages. 2 Mass. 39. It was therefore urged, that in this case the seamen were not to receive any wages, nor any thing more as salvage, than would have been allowed, if wages had been earned. That the question of salvage was to be in no measure influenced by the loss of wages.

STORY, Circuit Justice. Upon these facts the material questions are, (1) whether the seamen are entitled to any wages beyond those already paid to them; (2) if not, whether they can claim as salvors, out of the goods saved from the wreck.

It is, in my judgment, perfectly clear, that the seamen are entitled to wages up to the time of the ship's arrival at Ivica, and during half the time the ship remained there; for at that place the homeward voyage properly commenced. The ship's having gone from Gibraltar to Ivica in ballast does not vary the case, any more than it would, if the whole of the outward voyage had been performed by the ship in ballast, in which event the seamen would unquestionably have been entitled to their wages. This doctrine is not new in our courts. It was early decided in the supreme court of my native state, after full argument (see Millett v. Stephens, MSS. Sup. Ct. Mass. 1800, cited in Abb. Shipp. p. 4, c. 2, note 1; Abb. Shipp. [Story's Ed. 1810] pp. 487, 490; Hooper v. Perley, 11 Mass. 545), and about the same period adopted by a venerable admiralty judge of our own country. Giles v. The Cynthia [Case No. 5,424]. It appears to me to be a natural result of the principles held by Lord Holt in 12 Mod. 409, 442, and Ld. Raym. 639, 739. And the language of Mr. Justice Powell in Brown v. Benn, 2 Ld. Raym. 1247, demonstrates, that the admiralty had acted with the approbation of the courts of common law upon the rule, that the seamen were entitled to wages, if the vessel arrived at her port of destination, even though it might not be a port of delivery of any cargo. Nor do I consider the case of Hernamen v. Bawden, 3 Burrows, 1844, and Edwin v. East India Co., 2 Vern. 211, as impugning this doctrine, but rather as admitting it, and turning upon the peculiar construction of the contract in that case. My brother, Mr. Justice Washington, in a recent case (Thompson v. Faussat [Case No. 13,954]) adopted a rule somewhat different, deciding, that if a vessel, after discharging her outward cargo, should proceed in ballast to another port to take in a return cargo, and, after receiving it on board, should be lost in the homeward voyage, the seamen would be entitled to full wages up to her port of delivery, and half the time of her stay there; and at most to half wages from that period to the time of her departure from the port, where the return cargo was taken on board. His language, indeed, leaves it doubtful, whether even this latter allowance meets his approbation. "If," says he, "the vessel leaves her port of destination, or unlading, for the purpose of receiving a return cargo, she is at such ports to be considered, either as on her return voyage, or as being in the same situation, as if she had remained at her last port of unlading, there to receive a cargo. If the former, then the whole of the wages from the time she left her port of unlading, including half the time she lay there, would be lost in consequence of the subsequent capture; if the latter, the seamen would be entitled to half wages only during the whole time the ship lay at the port of delivery, and the port of lading and departure. But upon no principle, that I can distinctly comprehend, can the port of lading and departure be considered as the port of delivery, or in other

words, the termination of the outward voyage, unless there be something particular in the contract made with the seamen." The conclusion adopted by the learned judge, is certainly irresistible, if the premises are admitted. It proceeds upon the ground, that the outward voyage terminates at the port of unlivery of the outward cargo, and that there can be no intermediate voyage, which does not constitute a part of the return voyage. That is precisely the point, in which I humbly doubt the accuracy of his doctrine. If a vessel proceed from a port in the United States with a cargo to a foreign port, and there land the same, and take in another cargo for another foreign port, and after landing that cargo take in a return cargo, and be lost upon the homeward voyage, it is clear, that the seamen would be entitled to wages up to the last port of departure, and half the time the ship stayed there. The intermediate voyage would be entirely distinct from the homeward voyage. If the vessel were lost in the intermediate voyage, the seamen would still be entitled to their wages for the outward voyage. And if in such case the vessel on the outward voyage were in ballast, instead of being loaded, the seamen in the same event would be entitled to their wages in the same manner, as if there were a cargo on board. If this be so, it can make no difference, that the vessel is in ballast in the intermediate, instead of the outward, voyage. Whenever the vessel proceeds from one port to another in the service, and for the benefit of the owner, if he does not choose to load a cargo, it appears to me unjust, that his voluntary neglect should operate to the injury of the seamen. The general rule is, that the seamen are entitled to wages not only, when the owner earns freight, but when but for his own act he might earn it. I am not able, therefore, to bring my mind to adopt the doctrine of the learned judge, though no one has a more profound reverence for his judgment than myself, because it seems to me, that in the case proposed, the intermediate voyage in ballast neither constitutes a part of the outward, nor of the return, voyage. The great difficulty on this subject arises from the inaccurate language of the books, which speak of the earning of wages by an unlivery of the cargo at the port of delivery, as if they were not equally due by an arrival at the port of destination, when no cargo is on board, or when the owner chooses to bring the cargo back again. "Port of delivery," in the cases, where this doctrine is found, is a phrase used to distinguish the port of unlivery, or destination, from any port at which the vessel touches in the course of the voyage for other purposes as for advice, refreshment, inquiry after markets, or in consequence of stress of weather, or other necessity. Following, therefore, the analogy of the law in admitted cases, I feel myself constrained, upon my notions of this subject, to hold, that the voyage to Ivica was an intermediate voyage, and that the seamen are

entitled to their full wages up to the period of arrival, and during half of the time of the ship's stay there. To this extent, at all events, the seamen are entitled to wages.

But the most important question still remains, whether in the events that have happened, the seamen can claim wages, as such, for the homeward voyage, they having saved from the wreck property more than sufficient in value to cover all the wages. It is laid down as a general doctrine of the English maritime law, from which ours is derived, that the payment of wages is dependent upon the earning of freight; if no freight is earned in the voyage, no wages are due; for, in the expressive phraseology of the ancient law, freight is the mother of wages. Abb. Shipp. pt. 4, c. 2, § 4; 2 Brown, Adm. Law, c. 5, p. 176; 1 Ld. Raym. 639; Dunnett v. Tomhagen, 3 Johns. 154. There are exceptions to the rule not necessary here to be noticed, which on a former occasion, attracted the attention of the court. The Saratoga [Case No. 12,355]. Hence, if the ship be lost during the voyage, so that no freight is earned, the mariners lose their wages. Abb. Shipp. pt. 4, c. 2, § 4; 2 Brown, Adm. c. 5, p. 180 And by parity of reason, if by inevitable accident the freight is partly lost, it seems that the seamen lose a proportion of their wages. 2 Brown, Adm. 176, 180; Poth. Louage de Matelots, note 186; Abb. Shipp. pt. 4, c. 2, § 6; Consolato del Mare, c. 102. The ground of this doctrine is said to be, that "if the seamen should have their wages in such cases, they would not use their endeavors, nor hazard their lives, to save the ship." Anon., 1 Sid. 179. And the argument now is, that the reason of the rule shows, that it does not apply to a case of shipwreck, like the present, where the whole freight is lost; for if the seamen are not entitled to wages for salvage from the wreck, they can have no motive to remain by and use their exertions to save it. And it is earnestly contended, that all the cases, in which it has been held, that no wages are due to the seamen, are cases, not of shipwreck, but where the ship perished at sea, so that there was a total loss of ship and freight. See Molloy, bk. 2, c. 3, §§ 7, 10.

It appears to me, that upon the established doctrines of our law, where the freight is lost by inevitable accident, the seamen cannot recover wages, as such, from the ship owner. And that it is perfectly immaterial in such case, whether the ship be lost, or be in good safety. Nor does the case of shipwreck, strictly speaking, form an exception to the generality of this rule. It more properly introduces another principle, that of allowing salvage to the crew, where they cannot earn wages, and yet perform a meritorious service. Mr. Abbott in his valuable treatise has summed up the doctrine on this subject with great accuracy. He says, "In the case of shipwreck it is the duty of the seamen to exert themselves to the utmost to save as

much as possible of the vessel and cargo. If the cargo is saved, and a proportion of the freight paid by the merchant in respect thereof, it seems upon principle, that the seamen are also entitled to a proportion of their wages; and this is expressly directed by the French ordinance. And for their labour in saving the cargo or the remains of the ship, they, as well as other persons, may be entitled to a recompense by way of salvage." Abb. Shipp. pt. 4, c. 2, § 6; and see 2 Brown, Adm. 175, 176. The laws of Oleron, which may be considered as the primitive groundwork of the marine law of England, evidently contemplate a recompense of the same nature. Laws of Oleron, art. 3, Cleirac. 7. Some of the foreign ordinances provide for the payment of the seamen's wages on these melancholy occasions, if they exert themselves in saving the property, and even authorize a further recompense. Others provide for a recompense in general terms. And others again direct the payment of the wages out of the relics and materials saved from the ship. Laws of Wisbuy, arts. 15, 16; Cleirac. 84; Ord. Phil. II. 1563, tit. "Average," art. 12; Cleirac. 8; 2 Magens, 17; Hanseatic Ord. 1614, tit. 9, art. 5; Ord. Rotterdam, art. 219; 2 Magens, 114; Ord. de France, liv. 3, tit. 4, art. 9; 1 Valin, Comm. 703: Abb. Shipp. pt. 4, c. 2, § 6; 2 Brown, Adm. 180; Hanseatic Ord. art. 44; Malyne, 27; Weskett, Insur. tit. "Wages," 16, 17. Mr. Abbott after citing these ordinances, adds, that he has not been able to find any decision in point in the English law; but he considers it a proper inducement to be held out to seamen in cases of shipwreck, that they may obtain their wages, if they save sufficient to pay them, asserting at the same time, that their claim on the ship for wages does not seem according to the principles of law to extend to such a case.

If the question were entirely new, it might, perhaps, be more consistent with the principle of the rule, that the earning of wages shall depend on the earning of freight, to hold, that the case of shipwreck constituted an exception from the rule, and that the claim to wages was fully supported by the maritime policy, on which the rule itself rests. The French marine ordinance provides, that in case the ship is taken or wrecked, with a total loss of ship and goods, the seamen shall claim no wages. Ord. de la Marine, lib. 3, tit. 4, art. 7; 1 Valin, Comm. 701. Pothier in commenting on this article, says, that this is for reasons of expediency, to the end, that the fortune of the seamen may depend on that of the ship and merchandize, and thus the motive of their personal interest might prompt them, in case of accident, to make greater efforts for the preservation of the ship and merchandize. Poth. De Louage des Matelots, note 184. I quote, however, from the excellent translation of Mr. Cushing (pages 111, 112), to whose labors we are indebted for a work, that should be in the hands of every maritime lawyer. This is precisely the reason assigned in 1 Siderfin, 179; and it is most obvious, that if by the loss of the whole cargo the wages of the seamen are lost, they can have but little inducement to expose themselves to perils and difficulties in saving the materials of the ship. The French ordinance, therefore, properly follows up the maritime policy by providing, that if any part of the ship be saved, seamen engaged by the voyage or month shall be paid the wages, that have fallen due, out of the wreck preserved; and, if goods alone are saved, shall be paid in proportion to the freight received, and shall moreover be paid for their days' work in saving the wreck and cargo. Ord. de la Marine, lib. 3, tit. 4, art. 9; 1 Valin, Comm. 703; and see Jac. Sea Laws, 148, 151. Thus nailing the interest of seamen to the last plank of the ship, and the last remnant of the cargo. Valin commends in the strongest terms this doctrine, not only as just in itself, but as intimately connected with the public good (1 Valin, Comm. 701); and the other foreign ordinances, giving wages in addition to salvage, manifest the strong opinion of the commercial world on this subject. See, also, Weskett, tit. "Wages," arts. 16, 17; 2 Browne, Civil & Adm. Law, 180, 181; Code de Commerce, lib. 2, tit. 5, arts. 258, 259.

But whatever may be the true doctrine on this subject in respect to wages, I am clear, that upon principle the seamen are entitled to salvage for their labour and services in preserving the wreck of ship and cargo, or either. It is a claim founded in natural justice, and sustained by the most obvious motives of public policy and interest. It has been urged at the bar, that the crew, while their contract continues, can never be entitled to salvage, and that when their connexion with the ship is dissolved by shipwreck, they can claim no more than common salvors. It is admitted, that for ordinary exertions in the discharge of their duty the crew are not entitled to salvage, because such exertions are fully compensated by their wages, and are stipulated for by the very nature of their contract. See Newman v. Walters, 3 Bos. & P. 612; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. But to assert, that the crew in no case can become entitled to salvage is begging the very point in controversy; and no authority in support of the assertion has been, or, as far as my researches extend, can be adduced in its support. Sir William Scott on one occasion said, "it may be in an extraordinary case difficult to distinguish a case of pilotage from a case of salvage, properly so called, for it is possible, that the safe conduct of a ship into a port under circumstances of extreme danger and personal exertion may exalt a pilotage service into something of a salvage service." The Joseph Harvey, 1 C. Rob. Adm. 306; and see Newman v. Walters, 3 Bos. & P. 612. Yet pilotage arises from contract, and ordinarily induces

no right to salvage. The rescue of a ship after capture from the hands of the enemy by the original crew is a meritorious case of salvage, although it can scarcely be contended, that such capture immediately works an utter dissolution of the contract, or goes farther than to suspend it during the hostile occupation.

Valin indeed considers, that by the shipwreck the dissolution of the contract of the seamen necessarily follows, because the voyage is broken up. He supposes, that in such a case the seamen are free to abandon everything, because there is not due to them by the owner of the ship personally any wages or pay for expenses home, and of course there is nothing to say to them, if they refuse to work in saving the wreck. And he adds, perhaps it would be just to withhold from seamen who refuse to work, the wages fallen due, if any thing is preserved; but there must be a law expressly to decide it, for their wages are due out of the property, which is specially affected by them, whether they do or do not contribute to save it. 1 Valin, Comm. 704. Pothier adopts the same doctrine, declaring, that by the accident of superior force, which prevents the continuation of the voyage, both parties are released for the future from their engagements, and the seamen no longer owe their services; and for this reason he holds, that they are to be paid for their days' labour afterwards performed in saving the wreck of the ship or cargo. Poth. Louage de Matelots, note 187 (Cushing's translation) p. 113. I confess, that I doubt the general doctrine here stated. It is more consonant to reason, to justice, and to the nature of the contract, to hold, that in all cases of disaster the seamen are bound to remain by, and preserve the ship and cargo, as far as they can; and to punish their neglect by a forfeiture of any wages, which have been previously earned in the voyage. Although the voyage be broken up, or ended, it does not follow, that the contract of the seamen is dissolved, any more than a charter party would be dissolved by a shipwreck, so as to exempt the master from any care of the cargo. Duties may remain to be performed by master and seamen for the preservation of the ship and cargo, after the voyage is broken up, or becomes impossible to be pursued. And, in my judgment, it is a just interpretation of the maritime law on this subject to hold, that the duty of the seamen continues on these melancholy occurrences, as long as they can be useful in preserving the property at risk, and gathering up its fragments. And I feel the more confidence in this doctrine, since it stands approved by the laws of Oleron (Laws of Oleron. art. 3; Cleirac. pp. 7, 8); and by the most respectable foreign ordinances (Ord. Phil. II., 1563, tit. "Average," art. 12: Cleirac. 8; 2 Magens. 17; Ord. Antwerp; Weskett, tit. "Wages," 11; Ord. Rotterdam. arts. 216–220; 2 Magens. 114; Weskett, tit. "Seamen," 4; Hanseat. Ord. tit.

4, art. 29; Kuricke's Jus. Marit. Hans. 661, 751; Hanseat. Ord. 1597, art. 44; Malyne, 26; S. P. Cleirac. 104; Laws of Wisbuy, art. 15; Cleirac. 84); as well as by the authority of enlightened writers on the common law, and maritime law (Abb. Shipp. pt. 4, c. 2, § 6; Newman v. Walters, 3 Bos. & P. 612; Weskett, tit. "Shipwreck," 1, "Wages," 16, 17; Com. Dig. "Navigation" (I. 5); Cleirac. p. 8; Kuricke Jus. Marit. Hans. 751; Giles v. The Cynthia [Case No. 5,424]; Weeks v. The Catharina Maria [Id. 17,351]).

Assuming, therefore, as I do, that the crew were not ipso facto discharged from their contract by the shipwreck, but were still bound to labor for the preservation of ship and cargo, I am of opinion, that this does not disable them from claiming as salvors for extraordinary exertions in cases so perilous and fatal. It cannot be, that they are bound to labor, where there is no possibility of earning any reward; and if, by the very nature of the case, they are excluded from wages, that very circumstance raises a title of compensation by way of salvage. The sole ground, upon which they are denied salvage in common cases, is that they are earning wages within the line of their ordinary duty; and when this is removed, they stand upon the same right as other persons, to be paid a compensation pro opera et labore. In my humble judgment, there is not any principle of law, which authorizes the position, that the character of seamen creates an incapacity to assume the character of salvors; and I cannot but view the establishment of such a doctrine, as mischievous to the interests of commerce, inconsistent with natural equity, and hostile to the growth of sound morals and probity. It is tempting the unfortunate mariner to obtain by plunder and embezzlement, in a common calamity, what he ought to possess upon the purest maxims of social justice. And how stand the authorities on this subject? It appears to me, that in our own country there is, and for a long time has been, a great weight of judicial opinion in its favor. Judge Peters has uniformly sustained the right of salvage of the seamen in cases of shipwreck; and though he has been supposed at the bar to have allowed wages, eo nomine, in such cases, it is most manifest from his own expositions of his doctrines, that he considered the wages as merely a mode of ascertaining and fixing the rate of salvage. In Taylor v. The Cato [Case No. 13,786]; Giles v. The Cynthia [supra]; Weeks v. The Catharina Maria [supra] (see Weskett, tit. "Wages," 17), speaking of a shipwreck, he says, "The claim of the sailor is not under his contract for wages out of the freight; but in a new character, as a salvor, he regains a rightful claim to wages restored by his exertions in rescuing the articles saved, whether parts of the ship or cargo, from the perils or loss, to which the wreck had exposed them." And the lan-

guage of Judge Winchester in the case cited at the bar, may be interpreted in the same manner. Relf v. The Maria [Case No. 11,-692, note]. See Consolato, c. 135, 136; Cleirac. Juris. de la Marine, art. 18. The case of Frothingham v. Prince, 3 Mass. 563, has been supposed to have decided, that the seamen in cases of shipwreck were entitled to wages, as earned in the voyage. When that case was reviewed by this court in The Saratoga [Case No. 12,355], it was thought susceptible of the other explanation. And I am the more confirmed in that opinion, by what fell from the court in a more recent case. The late Chief Justice Parsons argued the case of Frothingham v. Prince for the plaintiff, and in delivering the judgment of the court in Coffin v. Storer, 5 Mass. 252, where the vessel was wrecked on the homeward voyage, after stating, that the wages of the outward voyage were due, he added, "the other wages would have been lost by the wreck, had not sufficient been saved to pay them. They are then a charge on the property saved, in the nature of expenses towards the salvage."

This review of American judicial opinions establishes it as a common and received doctrine, that the wages recovered in cases of shipwreck are recovered in the nature of salvage, and as such form a lien on the property saved. And in this view, they are perfectly consistent with the rule, that makes the earning of freight generally a condition of the payment of wages.

I find also, that Mr. Weskett, in his work on Insurance, states "that it is still frequently practised in England, to allow the wages of the master and sailors to be paid to the time of their discharge, out of the produce of the wreck of the ship and goods saved; and if the saved materials, after deducting the general charges of salvage, are insufficient for that purpose, the seamen to be satisfied therewith; unless the freight is insured and recovered, and in that case the seamen, (freight being the mother of wages) to recover the whole of their wages from the master or owner." This is certainly strong evidence of a general usage on this subject, especially as he considers, that the statutes of 12 Anne, St. 2, c. 18, and 26 Geo. II., c. 19, had allowed them salvage, without mentioning wages, and thereby, as he supposes, had "excluded the master and mariners from any other claim, formerly customary, as for wages." Weskett, Inst. tit. "Wages," art. 17. It is not necessary to consider, whether Mr. Weskett's construction of these statutes be correct or not. It is sufficient, that the English usage was in conformity with the principles of the American decisions.

Upon the principle, then, that the seamen are entitled to salvage, the only remaining question is, as to the quantum of salvage. This is a highly meritorious service on their part, and was attended with no inconsiderable peril and difficulty. The remnants and appurtenances of the wreck, greatly exceed the amount of the wages from the last port of departure; and under such circumstances, I should not be scrupulous in allowing the seamen a liberal compensation. There is no case, in which the seamen have been allowed a less sum than the wages due to them; and the positive commands of foreign ordinances, and the clear language of our own adjudications, all point to the same allowance. It appears to me, that there is sound policy and wisdom in fixing in ordinary cases of this sort, a settled salvage, at least to the extent of wages earned; leaving an additional recompense to be made in cases of extraordinary danger and gallantry, where the service is greatly enhanced by the preservation of life, and the great value of the property at stake. It will stimulate seamen to great intrepidity and alacrity in performing their perilous duties, and prevent those contests and embarrassments, which are always felt, when compensation is to rest in a floating and undefined discretion. I shall, therefore, allow, as salvage, the wages of the seamen for the homeward voyage up to the time of the commencement of the present process, the ship not having then actually reached her port, but the seamen having been discharged from farther duty.

A question has been made at the bar, as to the party by whom this charge is ultimately to be borne, by the underwriters on the ship, to whom she has been abandoned, or by the original ship owner. As all the parties in interest have requested a decision on this point, to prevent farther litigation, I am willing to declare my opinion, that in this case it must be borne by the underwriter on the ship. It is not like the ordinary charge of seamen's wages, which are a charge upon the ship owner, and are to be borne by the freight; but it is an expense in the saving of the materials of the ship for the benefit of the underwriters on the ship, and as they exclusively receive the benefit, they are to receive it cum onere. The case of Frothingham v. Prince, 3 Mass. 563, is directly in point; nor do I think, considering the circumstances of the case, that any thing ruled by the court in Coffin v. Storer, 5 Mass. 252, weakens the effect of the former decision. If it does, in my judgment the former stands upon the true principles of insurance. See 2 Emer. p. 177, c. 17, § 2, and seq.

Decree accordingly.